## IN THE US DISTRICT FOR THE DISTRICT OF MARYLAND

Karen Campbell McGagh
4307 Regalwood Terrace
Burtonsville, MD 20866
Plaintiff

*v.*

Baltimore County State's Attorney's Office
401 Bosley Avenue
Towson, Maryland 21204

Maryland Attorney General's Office
200 St. Paul Place
Baltimore, MD 21202

Baltimore County Police Dept.
Public Safety Building
700 East Joppa Road
Towson, MD 21286

Baltimore County
400 Washington Ave m1,
Towson, MD 21204

John Olszewski, Jr
400 Washington Ave m1,
Towson, MD 21204

Adam Lippe
401 Bosley Ave
Towson, MD 21204

Brian Wolf
10705 Red Run Blvd,
Owings Mills, MD 21117

Suzanne Cohen
410 Bosley Avenue
Towson, MD 21204

Scott Shellenberger
401 Bosley Avenue
Towson, MD 21294

USDC- GREENBELT
'24 AUG 30 PM 12:22

HD
Rcv'd by: H.E.

1:MJM24CV2533

Lisa Dever
401 Bosley Avenue
Towson, MD 21294

Lawrence Heller
600 Wyndhurst Ave Ste 307A
Baltimore, MD, 21210

Lester Shockman
Maryland Div. of Parole & Probation
6776 Reisterstown Road
Baltimore, MD 21215

Elizabeth Feenstra
Maryland Div. of Parole & Probation
6776 Reisterstown Road
Baltimore, MD 21215

Daniel Jawor
OAG, 200 St. Paul Place
Baltimore, MD 21202

Andrew Costinett
OAG, 200 St. Paul Place
Baltimore, MD 21202

Verizon Wireless
140 West St,
New York, NY 10007

Craig Silliman
Verizon Legal Department
140 West St
New York, NY 10007


DOES 1- 25 inclusive

## **COMPLAINT**

Plaintiff Karen Campbell McGagh brings this action against the State of Maryland, the Maryland Attorney General's Office, Baltimore County, Baltimore County State's Attorney's Office, the Baltimore County Police Department, Verizon, John Olszewski, Jr, Lester Shockman, Elizabeth Feenstra, Suzanne Cohen, Daniel Jawor, Andrew Costineett, Adam Lippe, Brian Wolf, Lisa Dever, Scott Shellenberger, Craig Silliman and other as-yet-unknown DOES 1 - 25, seeking damages to remedy the harms they caused her as a

direct result of their denial of her civil rights, negligence, civil conspiracy, failure to intervene, intentional infliction of emotional distress, and invasion of privacy under Maryland law. Each defendant acted under the color of law and knew their behavior was unlawful, outrageous, and offensive to society.  They are being sued personally and professionally.

Under *42 U.S.C. § 1983*, which states citizens may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]," and under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971),* section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. Plaintiff alleges, on personal knowledge as to herself and information and belief as to others, as follows:

## INTRODUCTION

1. Ms. McGagh initiated this lawsuit to seek redress for the civil rights violations and subsequent harm caused by the defendant's actions, individually and collectively.

2. They fabricated evidence and withheld exculpatory information. They acted with malice, willfulness, and reckless indifference to her rights. This egregious behavior has caused Ms. McGagh significant injury, including ongoing pain and suffering, financial devastation, and community scorn.

3. Some of these defendants just used taxpayer funds to settle a lawsuit filed by a different woman who reported assault and experienced retaliation at their hands. During that case, the defendant police officers admitted to stalking her. They refused to conduct investigations or deliver her legal paperwork. They even threatened her with prison. This is their pattern and practice.

4. When they found out that the woman's sister worked for the Baltimore County Courthouse, she was fired in retaliation, which they also admitted. They also sent police officers to scare her grandmother to have her grandmother convince her to drop her charges.

5. This complaint addresses each defendant's actions and interactions with others, which have devastatingly impacted Ms. McGagh.

## JURISDICTION AND VENUE

6. This Court has jurisdiction under *28 U.S.C. §§ 1331, 1367*. Venue is proper under *28 U.S.C. § 1391(b)*. The parties reside in this judicial district, and the events giving rise to the claims asserted herein also occurred here.  This Court has jurisdiction under *28 U.S.C. §§ 1331, 1367*. Venue is proper

under *28 U.S.C. § 1391(b)*. The parties reside in this judicial district, and the events giving rise to the claims asserted herein also occurred here.

## PROSECUTORIAL IMMUNITY

1.  In a similar lawsuit to Ms. McGagh's, U.S. District Judge Deborah K. Chasanow rejected a motion by State's Attorney Scott Shellenberger asking the court to issue a summary judgment. Chasanow found that there was sufficient evidence that a woman's rights were violated after she reported assault. She said officials should have known that they could not use "threats and intimidation," as defined in previous court decisions, to retaliate against the woman for pursuing the grievance.

2.  The woman sought charges against the men by going to Maryland District Court commissioners after prosecutors would not pursue her case. Her first application was denied after the commissioner conferred with Dever, a defendant in this case. She successfully filed a second application for charges with a court commissioner, who charged the men with sex offenses in 2018 (the year they sent Ms. McGagh to prison in retaliation for reporting an assault).

3.  Detectives stopped the criminal summonses from being delivered, and Shellenberger's office—which had said they wouldn't prosecute any charges against the men—ordered detectives to tell her to stop applying for charges or she could face a lawsuit or criminal charges, according to detectives' notes from the case. Detectives and an armed, uniformed county police officer showed up at her home, where her grandmother answered the door. According to court records, detectives spoke with her grandmother but never ordered the woman directly to cease.

4.  "Honestly, we sent the detective there just trying to give her friendly advice," Shellenberger said in an interview. "We didn't want her to get sued or charged with a crime by [the men accused of rape]. We were trying to help and protect her, but it has gotten twisted." While settling a lawsuit with the woman, they continued their brutish tactics against Ms. McGagh. This court must convey that this behavior won't be tolerated in a free country.

5.  In her written statement, Judge Chasanow clearly stated that ample evidence indicates that the woman's rights were violated. She emphasized that the officials should have been well aware that they were not allowed to resort to "threats and intimidation" in order to retaliate against the woman for her pursuit of the grievance, as this had been clearly defined in previous court rulings. The judge also emphatically asserted that the officials are not entitled to claim qualified immunity in this case.

Prosecutorial Immunity and Its Limits

6.  Prosecutorial immunity primarily shields prosecutors from lawsuits related to their decisions. It does not extend to actions not taken as part of the prosecutor's official responsibilities.

Privacy Rule and HIPAA

7.  The Standards for Privacy of Individually Identifiable Health Information, commonly known as the Privacy Rule, were established under the Health Insurance Portability and Accountability Act of 1996 (HIPAA). These standards are designed to protect individual's health information and ensure that it is used and disclosed appropriately. The U.S. Department of Health and Human Services (HHS) issued the Privacy Rule, and the Office for Civil Rights (OCR) within HHS is responsible for enforcing it.

8.  The Privacy Rule applies to "covered entities," including healthcare providers, health plans, and healthcare clearinghouses that electronically handle protected health information (PHI). To protect individuals' privacy rights, covered entities must adhere to strict guidelines regarding using and disclosing PHI.

Application to Ms. McGagh's Case

9.  In Ms. McGagh's case, the issue revolves around prosecutors' publication of her health information. When the prosecutors electronically accepted, stored, and published Ms. McGagh's health data, they became a "covered entity" under HIPAA. This means they are subject to HIPAA laws and the Privacy Rule's requirements regarding using and disclosing health information.

10. The case of *Bradley v. Fisher* provides insight into the limits of prosecutorial immunity. The court illustrated that a probate court prosecutor conducting a criminal trial would act beyond their jurisdiction, whereas a criminal court prosecutor conducting a trial for a non-illegal offense would simply act beyond their authority. This distinction is vital in assessing whether Ms. McGagh's prosecutors acted within their jurisdiction when they released false healthcare data.

11. Ms. McGagh anticipates that the defendants will argue based on *Stump v. Sparkman,* where the Supreme Court declared that prosecutors have absolute immunity from liability for their official prosecutorial acts, even if done maliciously or with procedural errors. In Stump, the Court decided that signing an order for sterilization was a prosecutorial act, and therefore, prosecutorial immunity applied. However, Ms. McGagh's situation is different because publishing health information is not a prosecutorial act and differs significantly from signing a court order.

## THE PARTIES

7. Mrs. Mcgagh is a 61-year-old Montgomery County resident working as a public relations consultant.

8. The Maryland Attorney General's Office, Baltimore County, Baltimore County Police Department, Baltimore County State's Attorney's Office, and the State of Maryland are municipal entities and

9. John Olszewski, Jr, Lester Shockman, Elizabeth Feenstra, Suzanne Cohen, Daniel Jawor, Andrew Costineett, Adam Lippe, Brian Wolf, Lisa Dever, Scott Shellenberger, and other as-yet-unknown DOES 1 - 25 are sued personally and professionally and acted under the color of law and in the scope of their employment as described in this Complaint.

10. Craig Silliman was Verizon's executive vice president chief administrative, legal, and public policy officer and a lobbyist. Silliman is an agent of the government. Verizon holds an estimated $500 million in Maryland government contracts, which they did not disclose at trial. Verizon provides wireless communication services for Baltimore County police, prosecutors, first responders, schools, and more. Many get their phones serviced at the Towson store where the incident occurred. Verizon and Silliman are sued as agents of Baltimore County, the Police, and the State's Attorney's office.

## PROCEDURAL HISTORY

**11. Conviction for Perjury by Affidavit**

a. Date/Time: December 17, 2017
b. Location: Baltimore State, Maryland, Circuit Defendants, Case No. 03K17003606
c. Description: Ms. McGagh was convicted of perjury by affidavit after reporting an assault. The conviction was based on video footage presented in Defendants, which showed 11 instances of assault but not the two instances she reported.

**12. Sentencing**

a. Date/Time: March 18, 2018
b. Location: Baltimore State, Maryland, Circuit Defendants
c. Description: Following a sentencing hearing, Ms. McGagh was sentenced to 8 ½ years in prison for misdemeanor perjury by affidavit.

**13. Appeal and Overturning of Conviction**

a. Date/Time: February 4, 2020
b. Location: Maryland Defendants of Special Appeals
c. Description: Ms. McGagh appealed her conviction, and the Maryland Defendants of Special Appeals overturned it based on the insufficiency of the evidence. She was subsequently released from prison on March 18, 2020.

**14. State's Writ of Certiorari**
   a. Date/Time: February 4, 2020
   b. Location: Defendants
   c. Description: The State filed a Writ of Certiorari to challenge the dismissal of Ms. McGagh's conviction, including numerous instances of false information.

**15. Reinstatement of Conviction**
   a. Date/Time: After the State's Writ of Certiorari
   b. Location: Defendants
   c. Description: The Defendants reinstated Ms. McGagh's conviction. In its written opinion, the Defendants included additional false statements not part of the trial record or the State's appeal.

**16. Petition for PostConviction Relief**
   a. Date/Time: Following the reinstatement of conviction
   b. Location: Defendants
   c. Description: Ms. McGagh filed a petition for postconviction relief. The State added false information to its answer, which it later acknowledged as false. Despite this, Ms. McGagh was denied postconviction relief and two appeals.

**17. Evidence of False Information**
   a. Date/Time: During the appeals process
   b. Location: Defendants
   c. Description: Ms. McGagh provided proof that the evidence against her was false, explicitly pointing out errors by Andrew Costinett and Daniel Jawaor of the Attorney General's Office. However, they failed to inform the Defendants of their errors.

**18. Communication with the Chief Justice's Clerk**
   a. Date/Time: Following the provision of proof
   b. Location: Defendants
   c. Description: Ms. McGagh emailed the Chief Justice's clerk, Amanda Miller, about the false statements. Despite this communication, no action was taken.

**19. Filing a Writ of Certiorari**
   a. Date/Time: After communication with the Chief Justice's clerk
   b. Location: Defendants
   c. Description: Ms. McGagh filed a Writ of Certiorari, providing evidence that someone included false statements in the Supreme Court's opinion.

## **BACKGROUND**

20. In the past decade, various news outlets such as *The Baltimore Sun, The Baltimore Brew, BuzzFeed, and New York* magazine have reported on the horrendous experiences of women who have reported assault in Baltimore County. Anna Borkowski is one of these women.

21. Ms. Borokowski's nightmare began after she reported being assaulted in Baltimore County. She learned something was wrong when Baltimore County police arrived at her grandmother's house, pretending to

check on her but were there to scare her. Their goal was to get the grandmother to convince her to drop her assault charges.

22.  Shortly after the police showed up at her grandmother's house, Ms. Borkowski's sister was fired from her Baltimore County job. Prosecutors later admitted they stalked Ms. Borkowski and her sister to see if they were related. Once they confirmed they were sisters, Ms. Borkowski's sister was abruptly fired. In depositions, police and prosecutors admitted the firing was retribution for Borkowski's refusal to drop her assault charges. Retaliation is a policy and coordinated practice of these defendants.

23. For instance, *The Baltimore Sun's* investigative journalism has shed light on systemic failures within the Baltimore County Police Department, including mishandling of evidence and no training for officers and prosecutors dealing with assault cases. *The Baltimore Brew* has focused on the personal stories of victims like Ms. Borkowski, illustrating the human cost of these systemic issues.

24. Meanwhile, *BuzzFeed* has provided in-depth analysis and a broader context, connecting individual cases and more significant trends within the State's law enforcement practices. *New York* magazine's story focused on the Baltimore County Police Department's retaliation against women who report assault.

25. The defendants' behavior is so outrageous that it's making national news. This time, they persist in their offensive and unlawful behavior against Ms. McGaght.

## **GENERAL ALLEGATIONS**

26. On the evening of April 24, 2017, Ms. McGagh arrived at a Verizon store in Towson, Maryland, for a routine service appointment. While at the store, a salesman approached her and took her to his desk at the back of the store. He took the SIM card from her phone and inserted it into his. Then, he pulled his chair next to her, with his leg touching hers. He started pressuring her to buy his products, which he kept hidden under his desk, in exchange for cash. Despite Ms. McGagh's repeated requests, the salesman wouldn't stop. Ms. McGagh alleges two touches were intimate.

27. Many people wonder why Ms. McGagh didn't get up and leave. Her decision to stay and comply with the salesman's demands was influenced by a complex interplay of professional, personal, and emotional factors tied to her SIM card. Her acute awareness of the potential misuse of images and data and the immediate threat posed to her professional contacts and personal photos created a dire situation where she felt she had no choice but to comply.

28. Professionally, Ms. McGagh had just completed a significant project involving the 9000 victims of Dr. Nikita Levy, a physician notorious for secretly taking pictures of women using a hidden camera.

This experience made her profoundly aware of the potential for abuse when sensitive images fall into the wrong hands.

29. On a personal level, Ms. McGagh was deeply concerned about the safety and privacy of her family members, including her children, nieces, and nephews. The idea of exposing them to the same kind of threats she had worked so hard to protect others from was unbearable. She understood the potential dangers of even a single photo falling into malicious hands.

30. Emotionally, the situation was exacerbated by the salesman's erratic behavior. He had already demonstrated that he was unhinged, adding a layer of unpredictability and danger to the encounter. Ms. McGagh's fear for her immediate safety, professional knowledge, and personal concerns left her feeling trapped. The instinct to protect her family overrode any other considerations, compelling her to comply with the salesman's demands.

31. The salesman used her SIM card to pressure her into examining and handling his exclusive products, such as cashmere sweaters, jewelry, and watches. He reeked of alcohol, and Ms. McGagh, who grew up in an alcoholic home, recognized the smell. He also made threats and racist remarks.

32. Only one portion of one video with the sound stripped was used to determine her guilt. Six years later, Ms. McGagh learned that other cameras in the store that day could have caught the missing intimate touches. Court records show the State's Attorney's office destroyed all the evidence the day after her trial despite the ongoing appeals and State and Federal laws regarding the preservation of evidence.

33. As the interaction between Ms. McGagh and the salesman progressed, his behavior became frightening. He asked her, "Where's hubby?" and told her he knew where she lived. He used the Verizon system to find her address. He asked her to celebrate with him and said he would stop by Wells Liquors on his way home. He said he wanted her to see the new porch he built, all while holding her SIM card hostage and touching her.

34. After two hours, another Verizon employee helped her leave, saying, "If you think it's bad what he is doing to you, you should see what he does to the college girls. " This underscored the severity and recurring nature of the salesman's behavior.

35. The next day, the salesman made good on his threat and called her at home. The call was disturbing, so she called the Baltimore County non-emergency number to ask what to do. A young police officer was sent to her house and said he guessed he was chosen because he had just taken sexual harassment

training.[1] She suggested a scary warning was all the salesman needed, but the officer said he needed more. Ms. McGagh wrote a statement of charges.[2]

36. Ms. McGagh notified Verizon of the incident, and they reviewed the videotape. Verizon's lawyer, Larry Carbo, watched the tape and knew that the salesman's behavior was unlawful but refused to help, a hypocritical move given Verizon's campaign against mass incarceration for nonviolent offenses.

37. When Ms. McGagh's case reached the Baltimore State Attorney's office, she received a call from Lisa Dever, a lawyer in the Baltimore County State's Attorney's office. Ms. McGagh would later learn Dever's victims allege that she is the architect of retribution against women and Shellenberger's right hand. Dever asked Ms. McGagh to come to her office to describe the assault incident in detail. Before leaving, Dever assured Ms. McGagh that she would subpoena the Verizon videotape that captured the incident, suggesting a thorough investigation would follow.

38. A few weeks later, Ms. McGagh was arrested, taken to a Baltimore County jail, and charged with making a false statement to a police officer and perjury by affidavit.

39. Someone removed the sound from the video, which showed eleven incidents of assault but not two of an intimate nature. Based on this portion of one silent video, Dever decided to drop Ms. McGagh's case and press charges against her.

40. Six years later, Ms. McGagh discovered that other cameras in the store could have captured the missing intimate instances and the salesman's threatening remarks. Court records show that the State's attorney's office destroyed all the evidence the day after the trial, knowing appeals were in the works.

41. Dever handed the case to two men in the Cyber Crimes unit with no training or familiarity with sexual assault cases: Wolf and Lippe. The men worked all their cases together and had been chastised for trying cases with no evidence. Ms. McGagh discovered Lippe and Wolf had a secret business arrangement while investigating and prosecuting her, a fact they admit. Wolf and Lippe began working to destroy Ms. McGagh.

42. Wolf and Lippe created two falsified police reports—an original and a supplemental. The supplemental report said Wolf learned about the case after receiving an anonymous call from the Citizens Complaint Bureau, but another detective will testify there is no Citizens Complaint Bureau.

---

[1] A 2019 Sexal Assault task force review cited 21 mistakes the Baltimore County Police Department was making, including that two people have to interview victims, one being a woman.
[2] The full discussion is available in court transcripts.

43. A witness from the State's Attorney's office claims that Dever told Cohen about what happened, and Cohen then relayed the information to everyone else. The identity of assault victims is supposed to be private, but it's alleged that these two individuals spread Ms. McGagh's name around the office and made fun of her complaint.

44. After a bench trial, Ms. McGagh was found guilty. The judge asked for a pre-sentence investigation assigned to Agent Elizabeth Feenstra, who wrote demonstrably bizarre and false statements. She quoted Ms. McGagh's sisters and mother, saying she was violent and unlawful. All three called and wrote to the court, saying they had never said those things. The false statements appear to have been cut and pasted from a psychiatric diagnostic manual. It seems that the defendants decided to diagnose Ms. McGagh as an untreatable sociopath and then fabricated statements to match the diagnostic criteria. Shockman, Feenstra's supervisor, approved the report.

45. Dr. Heller, the court-appointed psychiatrist, went along with this scheme. Dr. Heller only met with Ms. McGagh for 50 minutes, 20 of which were spent filling out paperwork. Heller was the first person to attach antisocial personality disorder to Ms. McGagh's name, a condition that is medically impossible to have.

46. According to the National Institute of Health (NIH), "To be diagnosed with antisocial personality disorder, a person has to have a history of conduct personality disorder before the age of 15." Ms. McGagh doesn't have such a history. The NIH also states that antisocial personality disorder is diagnosed after a rigorous, detailed psychological assessment. Hellerman spent a little over an hour with her, half of which was filling out paperwork and taking a test on the computer.

47. Then, quoting unnamed "sources," Heller insinuated Ms. McGagh was an alcoholic. Ms. McGagh has maintained continuous sobriety since 1988. She became sober at 24 and is committed to helping others in recovery. It's how she recognized signs of chronic alcoholism in the Verizon salesman. The unnamed "sources" were Lippe. Heller unlawfully kept Lippe's name out to give the false statement more weight.

48. Ms. McGagh was sentenced to 8 ½ years for perjury by affidavit and six consecutive months for making a false statement to a police officer, both misdemeanors. Next door, Dallas Dance, the former superintendent of Baltimore County Public Schools, was sentenced to five years in prison, with all but six months suspended, for four perjury counts.

49. While in prison, an inmate used fake papers to move into her empty house. Ms. McGagh's family called the police after the neighbors told them Ms. McGagh's car was missing and her belongings were being sold.

50. Lippe and Wolf prosecuted one of the squatters in a theft case. They knew she was on parole for a separate theft scheme and that she was not allowed to be released to Ms. McGagh's address. The squatters sold and got rid of her belongings, including her mother's piano. They also destroyed her house and yard, even taking cabinets off the walls.

51. Ms. McGagh's mother documented how many times she called the Baltimore County police asking for help. They refused to stop the squatters.

52. Later, Ms. McGagh discovered a police report stating that the officer was supposed to call Wolf regarding the situation at her house. The officer noted that he informed Wolf about the situation regarding Ms. McGagh's house and belongings, but Wolf said that the State's Attorney's office was dealing with it. Wolf and the prosecutors were aware of McGagh's possessions being sold and her house being destroyed, but did nothing.

53. The Court of Appeals overturned Ms. McGagh's conviction on February 14th, 2020, and she was released on March 18th. She was released with only the clothes on her back, her house and yard destroyed. She had to live in a hotel because she couldn't evict the squatters due to COVID-19. She watched helplessly as everything she had worked for was being destroyed.

54. Ms. McGagh was aware of Verizon and Silliman's campaign to end mass incarceration, so she called them for help. Despite their public commitments, they refused to help Ms. McGagh. During his speeches about mass incarceration Silliman said the Court System is broken at every level, and prisons are filled with too many nonviolent offenders. Perjury by Affidavit is a nonviolent misdemeanor. Ms. McGagh was sentenced to 8 1/2 years. Verizon's outside counsel watched the tape and knew Ms. McGagh was innocent. No one from Verizon helped her.

55. It's alleged that Verizon's outside counsel Larry Carbo worked with the defendants to send her back to prison. It's unclear who hid the footage from the other cameras in the store that day or who stripped the sound from the tape. Despite knowing about the appeals, the State's Attorney's office destroyed all evidence the day after the sentencing. Verizon and the defendants conspired to ensure the video evidence exonerating Ms. McGagh didn't go to the Court.

56. Even after Ms. McGagh and her family notified the state that they were using false evidence in the case, they included it in their Court filings.

57. Ms. McGagh continued to contact Verizon for help and they refused..

58. Verizon has government contracts with Maryland, estimated to be over $500 million. On the day in question, the defendants were using Verizon equipment.

59. Silliman was executive vice president for public policy and general counsel, leading the company's public policy, legal, regulatory, government affairs, and security groups. He has also served as senior vice president for public policy and government affairs. He is responsible for Verizon's global public policy, federal and state legislative affairs, federal regulatory affairs, strategic alliances, national security, privacy, and corporate citizenship. His job included lobbying and he wasn't about to jeaopardize his $500 million contract with Verizon.

60. Verizon continued to work with Lippe and Wolf to send her back to prison.

61. Ms. McGagh was sent back to prison and initially expected to serve the remaining few weeks of her sentence. She was shocked when she learned that her parole had been invalidated by the defendants. Witnesses will testify the defendants screamed and bullied him until he changed her parole status.

62. Ms. McGagh had been in Chapter 13 bankruptcy and paid her mortgage regularly. Lippe unlawfully added himself as a service contact on the civil proceedings, and while she was in prison her house was moved into foreclosure. As a contact on the foreclosure case, Lippe knew every person involved with foreclosure and had access to financial and other records he wasn't entitled to. The evidence suggests that he worked furiously through back channels to ensure Ms. McGagh lost her home.

63. Suddenly, the mortgage company informed her that the defendants had instructed them not to speak to her. She knew she shouldn't be in foreclosure status because the mortgage company misapplied payments, and she had the proof.

64. The lawyers for her mortgage were also told to refrain from communicating with her even though the loan on her house was still open. The paperwork proving the mortgage company misapplied payments was held in the clerk's office until the deadlines passed. A clerk told her she'd never seen anything like it because the paperwork was supposed to be handed to a judge that day.

65. The purchaser appeared in district court with handwritten numbers on scrap paper, claiming to have bought the house and was awarded Ms. McGagh's home. Despite Ms. McGagh having a title and the deed to her home, they moved to evict her. Ms. McGagh continued to hold title to the property for two more years. The house was just sold for $950,000. After the foreclosure, she was unlawfully locked out of her home before the eviction date and before she'd removed her remaining possessions.

66. Ms. McGagh had homeowners insurance she could have used to repair her house and replace her things. Michael Barranco, now Judge Barranco, was the insurance company's local lawyer. Lippe called him and demanded a list of what Ms. McGagh claimed on her insurance. Judge Barranco refused and called Ms. McGagh's lawyer to warn about Lippe's unlawful actions. Out of fear, Ms. McGagh dropped her claim and lost her entitled money.

67. Ms. McGagh continued to fight the false charges against her—the Supreme Court of Maryland's published opinion contained over twenty inaccurate or false statements. Taking the respectful approach, Ms. McGagh called the Chief Justice's clerk, Amanda Miller, and told her that the Court's published opinion contained many false statements. One issue was that the Court based its decision to reinstate her conviction on the damning testimony from a fictitious doctor. Although Miller said she would inform Chief Justice Fader immediately, Ms. McGagh never heard back.

68. Ms. McGagh assumed the court was busy and the paperwork needed to be recovered. She emailed each Supreme Court judge, proving their written statements were false. She emailed again with no response, and She assumed it was because she wasn't using the correct paperwork.

69. After Ms. McGagh filed a Writ of Certiorari, providing comprehensive evidence of the false statements, a form letter denied two writs. The letter stated that she had failed to prove that correcting the false statements was in the public's best interest. It's alleged that the defendants used extrajudicial conversations and backchannels to get Ms. McGagh's conviction reinstated.

### The Conspiracy to Deprive Ms. McGagh of her Constitutional Rights

70. During her post-conviction hearing, the defendants acknowledged using false evidence to uphold Ms. McGagh's conviction. One notable example is the false statement from a fictitious court-appointed psychiatrist, Dr. Kohn. According to the defendants, Ms. McGagh told Dr. Kohn, "She knows how to play the game and what to say" during the psychiatric assessment.

71. If Ms. McGagh knew how to play the game and what to say, she wouldn't have admitted that to a court-appointed psychiatrist. That's not playing the game; it's intentionally losing it. After conducting a simple Google search and checking the National Provider's Index, it is evident that no licensed psychologist or psychiatrist named Dr. Kohn in Maryland, whether court-appointed or not. It's not a spelling mistake because the defendants can't prove anyone said that about Ms. McGagh.

72. The defendants added it on purpose. The statement, "She knows how to play the game and what to say," suggests that Ms. McGagh is adept at deception. It indicates that she knows how to lie effectively and uses deceit to manipulate the prosecutorial process.

73. Maintaining credibility is essential in any legal proceeding, particularly in perjury cases. Describing Ms. McGagh as some evidence presented in her favor weakens her overall defense.

74. The false statement injected bias into the judicial review process, suggesting that Ms. McGagh is adept at manipulating the system. Ms. McGagh did not have the opportunity to refute the statements, which created a bias against her and violated her right to due process.

75. A court-appointed psychiatrist is assumed to be a neutral, unbiased party whose evaluations are based solely on professional judgment and objective observations. When such a figure reports a damning statement, it carries significant weight because it is perceived to come from an impartial source. This gives the statement undue credibility and influence.

76. Defendants rely heavily on the assessments of court-appointed experts to form their opinions. If an expert, believed to be neutral, presents a statement that paints the defendant negatively, it influences the judges' decision-making process. The statement, purportedly from a neutral court-appointed psychiatrist, further compounds its effect by making it seem more credible and authoritative. This led to an unjust review and decision, as the Court weighed false evidence.

77. The fictional Dr. Kohn is not the only false statement provided by the defendants. Here are others:

78. The defendants stated that Ms. McGagh had discovered "an outstanding balance on her account, which prevented her from immediately replacing her phone," causing her to get angry. This is not true."The Defendants wrote, "Ms. McGagh blew kisses at the salesman." This is not true.

79. The Defendants wrote in October 2015 that Ms. McGagh was pending trial for allegedly defrauding four individuals in a different case." This is not true. They wrote, "Verizon's surveillance video corroborated (the salesman's) testimony because it showed no touching that would have constituted impermissible sexual contact under Maryland's criminal statute." The video corroborated Ms. McGagh's testimony except for the missing two touches, which would have been caught had they not destroyed the footage.

   a.  The defendants stated, "Ms. McGagh admitted that the salesman did not touch her as she had claimed in her statement to the police and the charging document." Ms. McGagh never admitted that the alleged incident did not occur. She mentioned that she did not see it on the video, only to

discover later that there were other cameras in the store whose footage was destroyed and could have captured the two missing touches.

b.  Defendants asserted that Ms. McGagh introduced the video footage to prove her innocence. Ms. McGagh had nothing to do with that footage. Lippe and Wolf provided it, not the other way around, and evidence suggests they removed the sound so the Court wouldn't hear the salesman's threatening statements. Lippe also said Ms. McGagh stole $40,724 from the Friends School of Baltimore, which has nothing to do with whether or not she was intimately assaulted, but either way, it's not true. During post-conviction testimony, Lippe acknowledged he lied about that, too.

c.  Defendants said that his secret business dealings with Wolf didn't impact Ms. McGagh's case because Wolf didn't testify. Wolf was responsible for making false police reports, lying about receiving an anonymous phone call, and providing false information during a grand jury hearing.

d.  Defendants worked to convict Ms. McGagh for a crime they knew she didn't commit.

### The Defendants Accused Ms. McGagh of Being Another Racist White Woman Targeting Innocent black men. The problem is that the Man in Her Case is White

80. The defendants wanted to mislead the justices by comparing Ms. McGagh's case to an incident involving a white woman making false accusations against a black man who was out birdwatching for the day. They intended to exploit any unconscious bias the judges might have..

81. Ms. McGagh's incident and the woman making false allegations incident are very differen because they are based on different facts. In Ms. McGagh's case, there is evidence showing the salesman assaulted her eleven times. In the birdwatching case, the accused man was completely innocent, and the incident involved a white woman calling the police on a black man for no valid reason.

82. Ms. McGagh's case did not involve any racism. Unlike the birdwatching incident where a white woman wrongly accused a black man, Ms. McGagh's case did not have any racial dynamics. The man involved was white and she is white. Comparing Ms. McGagh's case to the birdwatching incident is not only inaccurate, but it was purposely designed to paint Ms. McGagh as a racist.This connection prevented her from getting a fair trial by making the public and judges see her as a racist.

83. This unfair comparison caused many personal and professional problems for Ms. McGagh. It made people look down on her and made it hard for her to find a job. The Defendants' actions created a false and attention-grabbing story about racial bias, which hurt Ms. McGagh's reputation and job prospects. The comparison shifted the focus from the actual evidence and specific details of Ms.

McGagh's case to a broader and misleading narrative of racial bias. This detracted from a fair and balanced examination of the case, leading to an unjust outcome.

### The Defendants Knew or Should Have Known Baltimore County's Retaliatory Policies

84. News stories have reported on the terrible treatment of women who report assault in Baltimore County. These stories provide real-life examples and testimonies of victims who faced retaliation, making it difficult for any defendant to claim ignorance about what was happening.

85. Many people knew what was happening and the tragedy could have been avoided if even one person reported it. However, no one did. This speaks volumes about the defendants' workplace cultures and willingness to follow the law.

### Defendants Violated  HIPAA

86. None of that false psychiatric information in any part of this case should ever have been published. The Health Insurance Portability and Accountability Act (HIPAA) requires that medical records remain private. HIPAA training is mandatory for individuals with access to protected health information (PHI) to ensure they understand and comply with regulations designed to protect the privacy and security of healthcare data. This is especially important for defendants in the judiciary who handle private medical information in legal proceedings. It appears the defendants weren't trained.

87. Even without HIPAA training, the defendants knew they were breaking the law. In various healthcare settings, the defendants must read and acknowledge HIPAA policies, reinforcing the importance of maintaining the confidentiality of medical records.

88. These experiences would give them a firsthand understanding of the importance of medical privacy and the need to protect sensitive health information.

89. Ms. McGagh couldn't provide the Court with the necessary waiver to release her health information because Dr. Kohn isn't a real person. The Defendants refuse to acknowledge and rectify their mistakes, even though Ms. McGagh provided evidence of their falsity.

### Verizon

90. On August 24, 2024, Ms. McGagh was shocked to learn that Verizon was a government contractor in Maryland with an estimated $500 million in government contracts. It's worth noting that all the

defendants were using Verizon's services on the day of the assault and Verizon has contract
obligations that include abiding laws and the Constitution. The defendants rely on Verizon's services
for their professional activities, with many of them servicing their phones at the Verizon store in
Towson due to its proximity to the government buildings.

91. Everyone agrees a Verizon salesperson assaulted Ms. McGagh, What made the situation more
concerning was that this behavior was not an isolated incident, and other employees witnessed the
misconduct without taking any action. Shockingly, one employee even appeared to be interested in
buying the salesman's man products for cash. The inaction becomes even more egregious considering
the salesman's history of similar misconduct and terminations from various positions due to
unauthorized sales and wrongful behavior. Verizon failed its duty to customers with negligent hiring.

92. The involvement of Larry Carbo as Verizon's external legal counsel exacerbated the legal
complexities. Despite the existence of video evidence supporting the salesman's culpability, Carbo
opted to collaborate with the defendants to secure Ms. McGagh's wrongful conviction instead of
advocating for her innocence. Despite Ms. McGagh's appeal for assistance from Verizon, she received
no support, and Verizon worked with the defendants against her.

93. Craig Silliman, the executive in charge of Verizon's legal and public policy teams, publicly addressed
the necessity of criminal justice reform, equitable sentencing for nonviolent offenses, and
rehabilitation programs for former inmates. However, his actions, or lack thereof, in Ms. McGagh's
case starkly contradicted his public statements. While Silliman advocated for criminal justice reform,
he declined to aid Ms. McGagh, who spent 8 1/2 years in a maximum-security prison for perjury by
affidavit - a misdemeanor. Verizon denied her aid and worked to ensure she was convicted.

94. **Studies Show There is No Such Thing As a Passive Bystander**

95. Research indicates that bystander involvement has a far greater impact than previously understood.
We now acknowledge that bystanders are pivotal in either perpetuating or alleviating harm. When
confronted with moral dilemmas, bystanders make decisions—intervene, ignore, or contribute to the
harm.

96. Personal values, perceived risks, and social pressures influence this decision-making process. Recent
studies highlight that there is no concept of an innocent bystander. The failure to safeguard victims,
particularly those most vulnerable, has been a significant factor in these cases. When bystanders
abstain from aiding, they effectively abandon the victims to confront their fate alone, rendering them
even more susceptible and intensifying their suffering.

97. The defendants witnessed what happened but chose not to get involved; some even joined. They often start by thinking, "It's none of my business," and then progress to excusing the behavior because they believe they can't do anything about it. Eventually, bystanders convince themselves that it's just one signature on a forged document or one small lie and are involved.

98. This is precisely what happened in Ms. McGagh's case. The responsibilities of prosecutors and employees involved in the process are responsible. As recent studies show, there are no "innocent bystanders" as their actions—or inactions— impacted the devastation of Ms. McGagh.

99. All the prosecutors and employees were pivotal in reinstating Ms. McGagh's conviction. They should have noticed these discrepancies despite being aware of the falsified evidence. Prosecutors hold the ethical responsibility to ensure that all evidence presented in court is factual and legitimate. Their failure to challenge the false evidence directly contributed to the miscarriage of justice in McGagh's case. The defendants' decision to use known false evidence to uphold the conviction was not just a lapse in judgment but a severe breach of Prosecutorial ethics.

100.    Numerous court employees and bystanders knew of the false evidence but did not intervene. This collective inaction underscores the significant role that bystanders play in victimization. Recent studies have shown that bystanders' involvement—or lack thereof—can be more harmful than previously realized. In the context of McGagh's case, these individuals might have thought their actions were inconsequential or "none of their business." However, their failure to act perpetuated the harm inflicted upon McGagh, making them complicit in the injustice.

101.    The initial step in reviving McGagh's conviction involved presenting false evidence. Although several individuals knew this evidence had been falsified, it was still brought forward in court. During the Prosecutorial review process, they could scrutinize the evidence presented. However, instead of questioning its validity, they accepted it, upholding McGagh's conviction.

102.    Court employees who handled the case documentation and evidence also played a crucial role. Their failure to report the discrepancies in the evidence further facilitated the wrongful conviction.

103.    Ms. McGagh sent emails directly to the justices, proving false evidence. Then, she filed a writ of certiorari, which was denied in a form letter saying she didn't prove that correcting false evidence was in the public's best interest. All the defendants knew or were participatingn in what happened.

**Ms. McGagh Suffered Severe Emotional Distress**

104.    Ms. McGagh's emotional distress, caused by the Defendants' use of false evidence to reinstate her conviction, is severe and multifaceted. The psychological impact on her is immense, significantly affecting her mental well-being and overall life.

105.    Ms. McGagh has experienced extreme public humiliation, resulting in a significant loss of social standing and reputation. Friends, family, colleagues, and the public may now view her as guilty, leading to a severe identity crisis and isolation from her community. This social stigma can be incredibly harmful, as those who once supported her might now distance themselves, creating a sense of loneliness and abandonment.

106.    Ms. McGagh suffers from deep feelings of hopelessness, sadness, and worthlessness. The betrayal by the Prosecutorial system has led to a profound loss of faith in societal institutions, exacerbating her depressive state and causing her to withdraw from social activities and struggle with daily tasks.

107.    Constant worry about her future and potential further injustices has resulted in severe anxiety, causing panic attacks and an overwhelming sense of dread. This has made it difficult for her to concentrate, perform at work, and maintain relationships.

108.    The chronic stress from her wrongful conviction has also led to significant physical health problems, including headaches, gastrointestinal issues, and a weakened immune system. This physical toll further compounds her emotional and psychological suffering.

109.    The Defendants' use of false evidence has questioned Ms. McGagh's integrity and undermined her fundamental right to a fair trial. This profound miscarriage of justice has shattered her faith in the legal system, making it incredibly difficult for her to trust the concept of justice and fairness again.

110.    Ms. McGagh's emotional distress is extensive and deeply rooted in the Defendants' unethical actions. Her experience highlights the far-reaching consequences of legal misconduct, affecting not only her mental and physical health but also her social standing and faith in societal institutions."

111.    The defendants are accused of intentionally or negligently introducing false evidence and sharing irrelevant medical information, significantly impacting the case outcome. These actions are said to be beyond the scope of their prosecutorial duties, making them accountable under established legal principles.

112.    In this instance, the defendants presented evidence that was later proven to be false. Specifically, this evidence included references to a therapist named Dr. Kohn, whose existence could not be verified. The National Provider Index (NPI) does not list such a therapist, and records from the Baltimore County

Defendants confirm that Dr. Kohn worked for the defendants. Furthermore, the defendants could not provide any individual who made the alleged statements about Ms. McGagh. This deliberate presentation of false evidence contradicts the ethical standards outlined in the Code of Prosecutorial Conduct, which mandates that defendants must uphold the integrity and independence of the judiciary.

113.    Prosecutorial immunity generally shields defendants from liability for acts performed within their prosecutorial capacity. However, as *Stump v. Sparkman, 435 U.S. 349 (1978)* established, defendants are not immune from actions "taken in the complete absence of all jurisdiction." In this case, the accused justices acted beyond their prosecutorial authority by introducing false evidence, thereby forfeiting their immunity.

114.    The defendants disclosed false medical information, exceeding their prosecutorial boundaries.

115.    Ms. McGagh's wrongful conviction has devastated her emotionally and financially. At 61 years old, she struggles with the harsh realities of economic ruin. She is unable to find employment due to her tarnished reputation and unjust criminal record, leaving her in a perpetual state of unemployment. Additionally, she has lost her home, which was her most significant asset, to cover legal fees and other expenses related to her wrongful conviction.

116.    The emotional toll of losing her home is immense, as it represented years of hard work, dedication, and security. Furthermore, her retirement savings, which she diligently built over decades, have been completely depleted in her fight for innocence. As she nears retirement age, her challenges are compounded, making starting over almost impossible.

117.    The job market is less forgiving to older individuals, and the combination of age and financial instability places Ms. McGagh in a vulnerable position. The prospects of recovery seem grim. Without a steady income, a home, or retirement savings, everyday expenses become a constant source of stress, worsening her emotional distress.

## The Defendants' Actions Destroyed Ms. McGagh's Finances

118.    The wrongful conviction of Ms. McGagh has not only shattered her emotional well-being but has also wreaked havoc on her financial stability, leaving her in a precarious and dire situation. At 61 years old, Ms. McGagh grapples with the harsh realities of economic ruin.

119.    One of the most immediate and devastating consequences of her wrongful conviction is the stark reality that no one will hire her. With a tarnished reputation and a criminal record that unjustly brands her as

guilty, potential employers are unwilling to take a chance on her. This has left Ms. McGagh in perpetual unemployment, unable to secure even the most basic job to sustain herself.

120.    The stigma associated with her conviction has closed once opened doors, and the professional world she once navigated confidently has become unwelcoming and hostile.

121.    Adding to her financial woes is the heartbreaking loss of her home, which was her most significant asset. The house representing years of hard work, dedication, and security is now gone. Forced to sell her home to cover mounting legal fees and other expenses associated with her wrongful conviction, Ms. McGagh is left without the stability and comfort of a place to call her own.

122.    The emotional toll of losing her home is immense; it was not just a physical structure but a sanctuary filled with memories and a sense of belonging.

123.    Furthermore, her retirement savings, meticulously built over decades of diligent work, have been completely depleted. These funds provided a safety net for her golden years, offering peace of mind and financial independence.

124.    Instead, her resources have been depleted in a desperate attempt to navigate the legal system and fight for her innocence. As she nears an age when most people are looking forward to retirement, Ms. McGagh faces an uncertain future with no financial safety net. At 61 years old, the challenges she faces are compounded. This stage in life makes starting over not just difficult but almost impossible.

125.    The job market is less forgiving to older individuals, and the energy and resilience required to rebuild a life from scratch are hard to come by. The combination of age and financial instability places Ms. McGagh in a vulnerable position, where the prospects of recovery seem grim.

126.    The practical impact of these financial setbacks on Ms. McGagh's life is severe. Without a steady income, a home, or retirement savings, everyday expenses become a constant source of stress. Food, healthcare, and transportation now weigh heavily on her shoulders. The financial strain worsens her emotional distress, creating a vicious cycle of worry and despair.

## Ms. McGagh's Maryland Tort Claim Was Denied

127.    Ms. McGagh has filed a written notice of claims based on the same underlying facts in this complaint. The State has denied Ms. McGagh's claim. These claims stated here are ripe for review.

## CLAIMS

## COUNT I -- 42 U.S.C. § 1983 DUE PROCESS

128.   Each paragraph of this Complaint is incorporated as if restated fully herein to provide a comprehensive understanding of the defendants' actions and their consequences.

129.   As described more fully above, all defendants, while acting individually, jointly, and in conspiracy, as well as under the color of law and within the scope of their employment, deprived Ms. McGagh of her constitutional right to a fair trial. Specifically, the Defendants deliberately withheld exculpatory evidence, fabricated reports, engaged in extra-judicial communications, provided false testimony, delayed filings until the deadlines had passed, and committed other unlawful acts. These actions collectively misled and misdirected the criminal prosecution of Ms. McGagh.

130.   The misconduct perpetuated by the defendants directly violated Ms. McGagh's constitutional right to due process as guaranteed by the Fifth Amendment and the Fourteenth Amendment of the United States Constitution. Absent this misconduct, Ms. McGagh's trial could not and would not have been pursued, and she would not have been convictedt.

131.   The actions described were carried out under the color of law and within the scope of the defendants' employment. The defendants' misconduct was not isolated but was instead part of a broader policy and practice of the Baltimore County Police Department, Baltimore County, and the Baltimore County State's Attorney's Office. These institutions had established patterns of engaging in such unlawful behavior, including Critical evidence that could have proven Ms. McGagh's innocence was deliberately kept from the defense. False information was created and included in official documents to support the prosecution's case. Unauthorized and inappropriate communications occurred outside the official judicial process, influencing the trial's outcome. Key papers and filings were intentionally delayed until the deadlines had passed, obstructing Ms. McGagh's ability to mount an effective defense.

132.   As a direct and proximate result of these actions and the violation of her constitutional right to a fair trial, Ms. McGagh suffered severe injuries. These injuries include, but are not limited to, emotional distress, reputational damage, financial loss, and other personal hardships more fully alleged above. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Ms. McGagh's constitutional rights.

133.   The defendants recklessly committed the alleged acts and disregarded the Plaintiff's rights. Their actions were negligent and demonstrated a willful and deliberate indifference to Ms. McGagh's

constitutional protections. This behavior underscores the need for punitive damages to address the harm done adequately.

134. Given the egregious nature of the misconduct and the defendants' reckless indifference to Ms. McGagh's rights, the Plaintiff seeks punitive damages. These damages are intended to punish the defendants and serve as a deterrent to similar future conduct. The punitive damages should be appropriate to punish the defendants and make them an example to the community, thus emphasizing the seriousness of upholding constitutional rights.

## COUNT II - FALSE IMPRISONMENT UNDER 42 U.S.C. § 1983

135. Each paragraph of this Complaint is incorporated as if restated fully herein to ensure a comprehensive understanding of the defendants' actions and their implications.

136. As described more fully above, all the Defendants, while acting individually, jointly, and in conspiracy, as well as under the color of law and within the scope of their employment, caused Ms. McGagh to be falsely imprisoned in violation of her constitutional rights. This false imprisonment was a direct result of the defendants' deliberate and unlawful actions, including but not limited to: Defendants provided false statements under oath to secure Ms. McGagh's detention; False evidence was created and used to justify her imprisonment; and  Ms. McGagh was arrested without probable cause or legal justification.

137. The false imprisonment of Ms. McGagh violated her constitutional rights under the Fourth and Fourteenth Amendments, which protect individuals from unlawful detention and ensure due process. The defendants' actions deprived Ms. McGagh of her liberty without legal justification, infringing on her fundamental rights.

138. The actions described were carried out under the color of law and within the scope of the defendants' employment. This misconduct was not an isolated incident but a part of a broader pattern and practice within the Baltimore County Police Department, Baltimore County, and the Baltimore County State's Attorney's Office.

139. As a direct and proximate result of this false imprisonment, Ms. McGagh suffered significant injuries, including but not limited to emotional distress, mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other consequential damages as more fully alleged above. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Ms. McGagh's constitutional rights.

140.    The defendants' actions were characterized by malice, willfulness, and reckless indifference to the rights of others. This deliberate disregard for Ms. McGagh's constitutional protections further evidences the defendants' callous and irresponsible behavior. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others, further evidencing the Defendants' deliberate disregard for Ms. McGagh's constitutional protections.

141.    The misconduct described in this Count was also undertaken under the policies and practices of Baltimore County, the Baltimore County State's Attorney's Office, and the Baltimore County Police Department. These institutions have established patterns of engaging in such unlawful behavior, demonstrating a systemic issue that facilitated Ms. McGagh's false imprisonment.

142.    Given the egregious nature of the misconduct and the defendants' reckless indifference to Ms. McGagh's rights, she seeks punitive damages. These damages are intended to punish the defendants and serve as a deterrent to similar future conduct. The punitive damages should be appropriate to punish the defendants and make them an example to the community. Lawsuits against them paid with taxpayer money have failed to deter their unlawful behavior, underscoring the need for meaningful consequences.

143.    The defendants' actions collectively resulted in Ms. McGagh's false imprisonment, violating her constitutional rights and causing significant personal and emotional harm. The Plaintiff seeks justice through appropriate compensatory and punitive damages to address these violations and prevent such misconduct in the future.


## COUNT III - COERCED CONFESSION UNDER 42 U.S.C. § 1983

144.    Each paragraph of this Complaint is incorporated as if restated fully herein to ensure a comprehensive understanding of the defendants' actions and their implications.

145.    As more fully described above, the defendants used unjustified coercion against Ms. McGagh to force her to confess to a crime she did not commit in a separate matter. This coercion included threats of denying her parole unless she pled guilty. Defendants falsely represented the strength of the evidence against Ms. McGagh to coerce her into an Alfred plea.

146.    Ms. McGagh's coerced confession violated her constitutional rights under the Fifth and Fourteenth Amendments, which protect individuals from self-incrimination and ensure due process. The defendants' coercive tactics deprived Ms. McGagh of her right to a fair trial and her right to remain silent without facing undue pressure.

147.    The actions described were carried out under the color of law and within the scope of the
defendants' employment. This misconduct was not an isolated incident but a part of a broader pattern
and practice within the Baltimore County Police Department, Baltimore County, and the Baltimore
County State's Attorney's Office.

148.    As a direct and proximate result of these violations, Ms. McGagh suffered significant injuries,
including but not limited to emotional distress, mental anguish, humiliation, degradation, physical and
emotional pain and suffering, and other consequential damages, as is more fully alleged above. The
misconduct described in this Count was objectively unreasonable and was undertaken intentionally
with willful indifference to Ms. McGagh's constitutional rights.

149.    The defendants' actions were characterized by malice, willfulness, and reckless indifference to the
rights of others. This deliberate disregard for Ms. McGagh's constitutional protections further
evidences the defendants' callous and reckless behavior. The misconduct described in this Count was
undertaken with malice, willfulness, and reckless indifference to the rights of others, further
evidencing the Defendants' deliberate disregard for Ms. McGagh's constitutional protections against
coerced confessions and wrongful convictions.

150.    The misconduct described in this Count was undertaken according to and in furtherance of the
Baltimore County Police Department's policy and practice, as described more fully above. This
misconduct was also perpetuated under the policies and practices of Baltimore County and the
Baltimore County State's Attorney's Office. These institutions have established patterns of engaging
in such unlawful behavior, demonstrating a systemic issue that facilitated the coercion of Ms.
McGagh's confession.

151.    Given the egregious nature of the misconduct and the defendants' reckless indifference to Ms.
McGagh's rights, the Plaintiff seeks punitive damages. These damages are intended to punish the
defendants and serve as a deterrent to similar future conduct. The punitive damages should be
appropriate to punish the defendants and exemplify them to the community. Lawsuits against them
paid with taxpayer money have failed to deter their unlawful behavior, underscoring the need for
meaningful consequences.

152.    The defendants' actions collectively resulted in Ms. McGagh's coerced confession, violating her
constitutional rights and causing significant personal and emotional harm. The Plaintiff seeks justice
through appropriate compensatory and punitive damages to address these violations and prevent such
misconduct in the future. This action aims to uphold the integrity of the legal system and ensure the

protection of constitutional rights for all individuals by holding the defendants accountable and seeking punitive damages.

## COUNT IV -- 42 U.S.C. § 1983 EQUAL PROTECTION

153.    Each paragraph of this Complaint is incorporated as if restated fully herein.

154.    As described more fully above, while acting individually, jointly, and in conspiracy, as well as under the color of law and within the scope of their employment, the defendants denied Ms. McGagh equal protection of the law in violation of her constitutional rights. Specifically, these defendants actively participated in or personally caused misconduct in a manner calculated to coerce confessions and secure unjust convictions.

155.    Said misconduct was motivated by gender bias and constituted purposeful discrimination; it also affected women in a grossly disproportionate manner vis-a-vis similarly situated males. Ms. McGagh was sent to the Maryland Correctional Institute for Women and placed with violent criminals, further exacerbating her distress and suffering.

156.    As a result of this violation, Ms. McGagh suffered injuries, including but not limited to emotional distress, mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other consequential damages, as is more fully alleged above. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Ms. McGagh's constitutional rights.

157.    The misconduct described in this Count was undertaken by the Baltimore County Police Department's policy and practice in the manner described above. This policy and practice perpetuated an environment where gender bias and discrimination against women suspects were tolerated and even encouraged, leading to the systematic violation of constitutional rights.

158.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others, further evidencing the defendants' deliberate disregard for Ms. McGagh's constitutional protections against gender-based discrimination and wrongful convictions.

159.    The defendants committed the alleged acts recklessly and with callous disregard for the Plaintiff's rights, entitling the Plaintiff to punitive damages in an amount appropriate to punish the defendants and make an example of them to the community. Lawsuits against them paid with taxpayer money have failed to deter their unlawful behavior.

## COUNT V- SECTION 1985(3) CONSPIRACY TO DEPRIVE CONSTITUTIONAL RIGHTS

160.   Each paragraph of this Complaint is incorporated as if restated fully herein, ensuring a thorough comprehension of the defendants' actions and implications.

161.   As described more fully above, the Defendants, while acting individually, jointly, and in conspiracy, as well as under the color of law and within the scope of their employment, conspired, directly or indirectly, to deprive Ms. McGagh of Equal Protection under the law. This conspiracy was characterized by intentional actions and agreements among the Defendants to commit acts that would violate Ms. McGagh's constitutional rights.

162.   In furtherance of this conspiracy, the Defendants took concrete actions that directly caused injury to Ms. McGagh. These actions included but were not limited to:

163.   Defendants imposed excessive bail on Ms. McGagh, making it nearly impossible for her to secure her release. Ms. McGagh was subjected to treatment that was biased based on her gender, reflecting a discriminatory intent. Ms. McGagh was placed in a correctional facility with violent criminals, endangering her safety and well-being.

164.   Each of these acts was part of a coordinated effort to undermine Ms. McGagh's rights and ensure her unjust treatment and conviction.

165.   The actions described were carried out under the color of law and within the scope of the Defendants' employment. This misconduct was not an isolated incident but a part of a broader pattern and practice within Baltimore County, the Baltimore State's Attorney's Office, and the Baltimore County Police Department.

166.   As a direct and proximate result of this conspiracy, Ms. McGagh suffered significant injuries, including but not limited to emotional distress, mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other consequential damages. The Defendants' actions violated Ms. McGagh's rights and set a dangerous precedent for treating other individuals within the jurisdiction.

167.   The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others. The defendants showed a blatant disregard for Ms. McGagh's constitutional protections, acting with the intent to cause harm and violate her rights.

168.   Moreover, the misconduct described in this Count was carried out under the policies and practices of the Maryland Attorney General's office, Baltimore County, the Baltimore State's Attorney's Office, and the Baltimore County Police Department. These entities fostered an environment where such conspiracies could flourish, allowing the defendants to act with impunity and without fear of

repercussions. The systemic nature of this misconduct further underscores the deliberate and coordinated effort to deprive Ms. McGagh of her constitutional rights.

169.    The Plaintiff seeks punitive damages due to the egregious nature of the misconduct and the defendants' reckless indifference to Ms. McGagh's rights. These damages are intended to punish the defendants and serve as a deterrent to similar future conduct. The punitive damages should be appropriate to punish the Defendants and make an example of them to the community. Lawsuits against them paid with taxpayer money have failed to deter their unlawful behavior, underscoring the need for meaningful consequences.

170.    The defendants' actions collectively resulted in a conspiracy to deprive Ms. McGagh of her constitutional rights, causing significant personal and emotional harm. The Plaintiff seeks justice through appropriate compensatory and punitive damages to address these violations and prevent such misconduct in the future. This action aims to uphold the integrity of the legal system and ensure the protection of constitutional rights for all individuals by holding the defendants accountable and seeking punitive damages.

## COUNT VI -- Violation of Ms. McGagh's Right to Privacy Against the State of Maryland for the Actions Under the Color of Law

171.    Each paragraph of this Complaint is incorporated as if restated fully herein, ensuring a comprehensive understanding of the Defendants' actions and their implications.

172.    The defendants publicly disclosed false medical information, both in person and electronically, thereby violating her right to privacy. This disclosure is inherently offensive and objectionable to a reasonable person of ordinary sensibilities.

173.    When the Defendants shared the false medical information, details about Ms. McGagh's health were not public knowledge. This includes the information falsely identifying Dr. Kohn as a court-appointed psychiatrist and graphic and false details regarding Ms. McGagh's mental health. Such disclosure served no legitimate public purpose and was done maliciously to harm Ms. McGagh's reputation and emotional well-being.

174.    As a direct and proximate result of the Defendant's conduct, Ms. McGagh has suffered and continues to suffer severe emotional distress. In committing the acts alleged herein, the defendants are guilty of oppression, fraud, and/or malice within the meaning of Maryland Law. Such egregious conduct entitles Ms. McGagh to seek punitive or exemplary damages. These damages are necessary to

punish the Defendants and serve as a deterrent to others, making an example of the Defendants to the community.

175.    The Attorney General's office, the State's Attorney's Office, the police, and the County are liable for injuries proximately caused by acts or omissions of their employees within the scope of their employment. Upon information and belief, at all times material, the State employed the defendants under its direction and control when they engaged in the conduct described above.

176.    These employees had access to Ms. McGagh's false psychiatric information through their employment, and their wrongful acts were committed within the scope of their duties. The Defendants' actions in publicly disclosing false medical information about Ms. McGagh without any legitimate governmental purpose constitute a gross violation of her right to privacy.

177.    The municipal entities are liable for their employees' negligent and wrongful conduct. The Defendants committed the alleged acts recklessly and with callous disregard for the Plaintiff's rights, entitling the Plaintiff to punitive damages in an amount appropriate to punish the Defendants and make an example of them to the community. Lawsuits against them paid with taxpayer money have failed to deter their unlawful behavior.

178.    The Defendants' actions collectively resulted in a gross violation of Ms. McGagh's right to privacy, causing significant emotional and psychological harm. The Plaintiff seeks justice through appropriate compensatory and punitive damages to address these violations and prevent such misconduct in the future. This action aims to uphold the integrity of the legal system and ensure the protection of privacy rights for all individuals by holding the defendants accountable and seeking punitive damages.

## COUNT VII -- STATE LAW CLAIM MALICIOUS PROSECUTION

179.    In the manner described more fully above, during the constitutional violations described above, one or more of the Defendant Officers (and other as-yet-unknown Baltimore County Police Officers) stood by without intervening to prevent the misconduct. Despite having the power and duty to avoid the constitutional violations that were being perpetrated against Ms. McGagh, these officers failed to take any action to intervene or stop the wrongful acts. The concept of "failure to intervene" under 42 U.S.C. § 1983 holds that police officers have an affirmative duty to prevent fellow officers from violating an individual's constitutional rights. When officers observe misconduct, they are expected to act to prevent harm if they are in a position to do so.

180.   In this situation, the Defendant Officers had a reasonable opportunity to prevent the harm inflicted upon Ms. McGagh but failed to act. Their inaction resulted in Ms. McGagh suffering significant pain and injury, as well as severe emotional distress. For instance, if an officer witnesses another officer using excessive force, they must step in and stop the misconduct. Failure to intervene in such scenarios violates the victim's constitutional rights, particularly under the Fourth (protection against unreasonable searches and seizures) and Fourteenth (equal protection under the law) Amendments.

181.   The misconduct by the Defendant Officers was objectively unreasonable and undertaken with willful indifference to Ms. McGagh's constitutional rights. Objectively unreasonable conduct refers to actions (or inactions) that no reasonable officer would take under the same circumstances. By failing to act, the officers not only exacerbated the harm suffered by Ms. McGagh but also demonstrated a blatant disregard for the legal protections afforded her.

182.   The misconduct described in this Count was carried out under and in furtherance of the municipal entities' policy and practice. This policy and practice created an environment where defendants felt encouraged to ignore their duty to intervene in the face of constitutional violations, knowing that such misconduct would go unchecked and unpunished. This systemic issue within the municipal entities fosters a culture of impunity, where officers prioritize protecting each other over upholding the constitutional rights of individuals.

183.   Despite having the opportunity and obligation to do so, the defendants and municipal entities' failure to intervene directly contributed to the violation of Ms. McGagh's constitutional rights and caused her to suffer substantial harm. This failure is not an isolated incident but indicative of a broader policy and practice within the municipal entities. Such practices prioritize the protection of officers over the constitutional rights of individuals, leading to repeated violations and a lack of accountability.

184.   The defendants and municipal entities' failure to intervene in the face of clear constitutional violations against Ms. McGagh resulted in significant harm to her. It highlighted systemic issues within the municipal entities.

## COUNT VIII -- STATE LAW CLAIM CIVIL CONSPIRACY

185.   Each paragraph of this Complaint is incorporated as if restated fully herein.

186.   As described more fully in the preceding paragraphs, the defendants, acting in concert with other known and unknown co-conspirators, engaged in a conspiracy. This conspiracy was characterized by

concerted actions aimed at accomplishing an unlawful purpose through unlawful means. The coordinated efforts of these individuals were deliberate and intended to achieve their malicious goals.

187.    In furtherance of the conspiracy, the defendants committed overt acts and were otherwise willful participants in joint activity. These incidents were not isolated but part of a broader, coordinated effort to violate Ms. McGagh's rights. For example, the defendants may have shared information, coordinated their actions, and covered up their misconduct to ensure the success of their unlawful objectives. The defendants' participation in these acts was intentional and with full awareness of their illegality and potential consequences.

188.    The misconduct described in this count was undertaken with malice, willfulness, and reckless indifference to the rights of others. The defendants acted with a blatant disregard for the legal and constitutional protections afforded to Ms. McGagh and others. Their actions were driven by a malicious intent to cause harm and infringe upon Ms. McGagh's rights. This includes alleged actions such as fabricating evidence, using excessive force, or otherwise acting outside the bounds of the law.

189.    As a proximate result of the defendants' conspiracy, Ms. McGagh suffered significant damages, including severe emotional distress and anguish, as is more fully alleged above. The coordinated and malicious actions of the defendants had a profound and detrimental impact on Ms. McGagh's mental and emotional well-being, causing lasting harm. For instance, the emotional trauma from being targeted by multiple officers acting in concert can lead to conditions such as anxiety, depression, and post-traumatic stress disorder (PTSD).

190.    The defendants' participation in a civil conspiracy to achieve an unlawful purpose through unlawful means resulted in significant harm to Ms. McGagh. Their willful and malicious actions, undertaken with reckless indifference to her rights, caused severe emotional distress and anguish. The coordinated nature of their misconduct underscores the severity of the violation and the extent of the damages suffered by Ms. McGagh. This coordinated effort shows a systemic issue rather than isolated incidents, raising the gravity of the case.

191.    The defendants committed the alleged acts recklessly and with callous disregard for the Plaintiff's rights, entitling the Plaintiff to punitive damages in an amount appropriate to punish the Defendants and make an example of them to the community. Lawsuits against them paid with taxpayer money have failed to deter their unlawful behavior. Therefore, punitive damages are necessary to compensate Ms. McGagh and serve as a deterrent against future misconduct by clarifying that such actions will have severe financial consequences for the perpetrators.

192.    The Department of Justice considers these actions a Hate Crime because they targeted Ms.
McGagh based on gender. This additional layer of malicious intent further aggravates the seriousness
of the conspiracy and the resultant damages. Hate crimes are particularly heinous as they are driven
by prejudice and discrimination, amplifying the emotional and psychological harm inflicted on the
victim. The Defendants' coordinated and malicious actions, undertaken with reckless indifference to
Ms. McGagh's rights, resulted in severe emotional distress and significant damages. The civil
conspiracy to achieve an unlawful purpose through unlawful means underscores the systemic issues
within the department and highlights the need for punitive measures to deter future misconduct.

### COUNT IX-- INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

193.    Each paragraph of this Complaint is incorporated as if restated fully herein. As stated above, the
Defendants' acts and conduct were extreme and outrageous. The actions perpetrated by the Defendant
Officers and Prosecutors went beyond the bounds of decency and are intolerable in a civilized society.
These actions were not merely offensive or inappropriate but egregious and calculated to cause
significant harm. For instance, their actions might have included severe harassment, false accusations,
or other malicious behaviors designed specifically to torment Ms. McGagh.

194.    The defendants intended to cause or were recklessly disregarding the probability that their conduct
would cause severe emotional distress to Ms. McGagh. They were fully aware of the likely impact of
their actions on Ms. McGagh's mental and emotional well-being, yet they proceeded with their
misconduct without concern for the consequences. This reckless indifference further underscores the
malicious nature of their behavior. This could involve scenarios where Defendants knowingly made
false statements or engaged in prolonged harassment, knowing it would severely impact Ms.
McGagh's mental state.

195.    The said actions and conduct did directly and proximately cause severe emotional distress to Ms.
McGagh. The intentional and malicious actions of the Defendants were a direct cause of the
emotional and psychological suffering experienced by Ms. McGagh. This distress was not a distant or
tangential result but a foreseeable and inevitable outcome of their extreme and outrageous conduct.

196.    The misconduct described in this count was undertaken with malice, willfulness, and reckless
indifference to the rights of others. The defendants' actions were a deliberate and vicious effort to
inflict emotional harm on Ms. McGagh. Their willingness to pursue such actions reflects a blatant

disregard for her rights and well-being. This includes allegedly ignoring clear evidence of harm or complaints from Ms. McGagh, continuing their behavior regardless.

197.    As a proximate result of the defendants' wrongful acts, Ms. McGagh suffered damages, including severe emotional distress and anguish, as is more fully alleged above. The emotional toll of the defendants' actions has had a profound and lasting impact on Ms. McGagh, affecting her mental health and overall quality of life. The severity of the distress and anguish experienced by Ms. McGagh underscores the gravity of the defendants' misconduct. Ms. McGagh has experienced significant disruptions in her daily life, relationships, and ability to work due to the emotional trauma inflicted by the defendants.

198.    The defendants' extreme and outrageous conduct, undertaken with the intent or reckless disregard for causing severe emotional distress, constitutes intentional infliction of emotional distress. Their malicious and willful actions directly harmed Ms. McGagh significantly emotionally. This Count highlights the severe impact of the Defendants' wrongful acts on Ms. McGagh's emotional and psychological well-being, warranting appropriate legal redress.

199.    The defendants committed the alleged acts recklessly and with callous disregard for the Plaintiff's rights, entitling the Plaintiff to punitive damages in an amount appropriate to punish the Defendants and make an example of them to the community. Lawsuits against them paid with taxpayer money have failed to deter their unlawful behavior. Therefore, punitive damages are necessary to compensate Ms. McGagh and serve as a deterrent against future misconduct by clarifying that such actions will have severe financial consequences for the perpetrators.

200.    The extreme and outrageous conduct of the defendants, undertaken with malice and reckless disregard for the likely impact on Ms. McGagh, has resulted in severe emotional distress and significant damages. The intentional infliction of emotional distress by the Defendants necessitates both compensatory and punitive damages to address the harm caused and deter future misconduct.

## COUNT IX - STATE LAW CLAIMS RESPONDENT SUPERIOR

*(against municipal entities)*

201.    Each paragraph of this Complaint is incorporated as if restated fully herein. In committing the acts alleged in the preceding paragraph, the defendants were employed by Baltimore County, the Baltimore County police department, the State of Maryland, and the Maryland Attorney General's office. At all relevant times, the defendant acted within the scope of employment and under the color

of law. This means that his actions, as described in the preceding paragraphs, were part of their official duties and responsibilities.

202.   The municipal entities in this complaint are liable as principals for all torts their agents commit. This legal principle, known as "respondeat superior," holds employers or principals legally responsible for the actions of their employees or agents when those actions occur within the scope of employment. In this case, the wrongful acts committed by the defendants and their agents are attributed to their respective employers.

203.   The municipal entities listed in this claim employed the defendants when they committed the acts alleged in the preceding paragraphs. At all relevant times, they acted within the scope of employment and under the color of law as part of their official duties.

204.   The defendant municipal entities are liable as principals for all torts its agents commit. The doctrine of respondeat superior applies here, making these entities responsible for the actions of their employees when those actions were conducted within the scope of their employment. This ensures that the entities cannot escape liability for the wrongful acts of their agents.

205.   The principle of respondeat superior holds the municipal entities above acted within the scope of their employment and under the color of law when they committed the alleged acts. As a result, the wrongful acts of these agents are attributed to their respective employers, who are legally responsible for any resultant harm or damages.

206.   The defendants committed the alleged acts recklessly and with callous disregard for the Plaintiff's rights, entitling the Plaintiff to punitive damages in an amount appropriate to punish the defendants and make an example of them to the community. Lawsuits against them paid with taxpayer money have failed to deter their unlawful behavior.

## COUNT X - STATE LAW CLAIM: INDEMNIFICATION

*(against municipal entities)*

207.   Each paragraph of this Complaint is incorporated as if restated fully herein.

208.   Under Maryland law, public entities must pay any tort judgment for compensatory damages for which their employees are liable, provided the employees acted within the scope of their employment. This statutory obligation ensures that individuals wronged by the actions of public employees can receive the compensation to which they are entitled, even when the employees themselves may not have the financial resources to satisfy the judgment.

209.   At all relevant times, the defendants were employed by the municipal entities acting under the color of law.  The defendants acted within the scope of their employment when committing the misconduct described herein. As agents of the municipal entities, their actions are directly attributable to the department, making it responsible for any compensatory damages awarded due to their wrongful actions.

210.   Their actions, as detailed in the preceding paragraphs, were committed within the scope of their employment. These individuals, acting as representatives of the municipal entities, engaged in conduct that harmed Ms. McGagh. Therefore, the municipal entities in the complaint are liable for any compensatory and punitive damages awarded due to their misconduct.

211.   Given their employment status and the scope of their actions, the municipal entities are legally obligated to indemnify these employees. This means they must pay any tort judgment for compensatory damages arising from the employees' actions that fall within the scope of their employment. This indemnification is crucial to ensuring that Ms. McGagh receives the full measure of compensation for the harm she has suffered.

212.   Under Maryland law, the municipal entities in this complaint must indemnify their employees for any compensatory damages resulting from actions taken within the scope of their employment. Since the defendants acted within the scope of their employment when committing the alleged misconduct, these public entities are liable for the resulting damages. This count seeks to ensure that Ms. McGagh receives the compensation she deserves for the emotional distress and other harm caused by the defendants' actions.

213.   The defendants committed the alleged acts recklessly and with callous disregard for the Plaintiff's rights, entitling the Plaintiff to punitive damages in an amount appropriate to punish the defendants and make an example of them to the community. Lawsuits against them paid with taxpayer money have failed to deter their unlawful behavior. Therefore, punitive damages are necessary to compensate Ms. McGagh and serve as a deterrent against future misconduct by clarifying that such actions will have severe financial consequences for the perpetrators.

214.   Municipal entities have a legal obligation to indemnify their employees for compensatory damages resulting from actions taken within the scope of their employment. This indemnification is essential to ensure that Ms. McGagh receives the compensation she deserves for the emotional distress and other harm caused by the defendant's actions. Additionally, punitive damages are warranted to punish the defendants and deter future misconduct.

## COUNT XI - STATE LAW CLAIM: FREEDOM OF SPEECH

215.    Each paragraph of this Complaint is incorporated as if restated fully herein.

216.    The First Amendment of the United States Constitution guarantees the right to petition the government to redress grievances. This protection extends to criminal complaints against individuals, ensuring citizens can seek justice and hold wrongdoers accountable without fear of retaliation or suppression. Freedom to report crimes and seek redress is fundamental to democratic governance and individual liberty.

217.    The circumstances surrounding this case result from an impermissible abridgment of the plaintiff's right to petition the government. In the landmark case of *New York Times Co. v. Sullivan, 376 U.S. 254, 285 (1964)*, the Supreme Court underscored the importance of protecting free speech, especially concerning matters of public concern. The Court recognized that open debate and the ability to speak freely about public issues are essential to the functioning of a democratic society.

218.    In this instance, the plaintiff's efforts to report an assault and seek justice were unlawfully hindered, violating her First Amendment rights. The defendants engaged in actions that effectively silenced the plaintiff, preventing her from exercising her constitutionally protected rights to speak out and seek redress for her grievances. This violation of her rights harmed her and struck at the core of the constitutional protections meant to safeguard all citizens.

219.    Maryland's public policy strongly encourages individuals, particularly women, to seek legal recourse against their assailants. The state emphasizes protecting victims' constitutional rights, recognizing the importance of upholding them while holding the responsible parties accountable for their unlawful actions.

220.    However, the defendants acted contrary to this public policy by obstructing the plaintiff's attempts to report the assault and seek justice. Their actions violated the plaintiff's constitutional rights and undermined the state's commitment to protecting victims and upholding the rule of law.

221.    The defendants recklessly committed the alleged acts and disregarded the Plaintiff's rights. Their actions were not mere oversights or errors in judgment but deliberate efforts to suppress the plaintiff's voice and deny her the justice she sought. This reckless indifference to the plaintiff's constitutional protections warrants punitive damages to deter similar conduct in the future.

222.    The Plaintiff is entitled to punitive damages appropriate to punish the defendants and set an example for the community. The defendants ' unlawful behavior has persisted despite previous lawsuits and judgments paid with taxpayer money. Punitive damages are necessary to send a clear

message that such violations of constitutional rights will not be tolerated and to incentivize the defendants to change their unlawful practices.

223. The defendants' actions have resulted in a significant violation of the plaintiff's First Amendment rights. By hindering her ability to report an assault and seek justice, the defendants not only harmed her individually but also undermined the fundamental principles of free speech and the right to petition the government for redress of grievances. Maryland's public policy protects these rights, particularly for victims seeking legal recourse. The reckless and callous disregard for the plaintiff's rights warrants punitive damages to punish the defendants and deter future misconduct.

## COUNT XII - NEGLIGENCE

224. Each paragraph of this Complaint is incorporated as if restated fully herein.

225. In the case of Ms. McGagh, the negligence claim arises from the Defendants' inclusion and dissemination of false evidence. The Defendants failed to prevent the spread of this false evidence and private medical information, resulting in significant harm to Ms. McGagh. This negligence led to the unjust reinstatement of a conviction, causing her emotional distress, physical harm, public scorn, and financial ruin.

226. Including false evidence violated Ms. McGagh's constitutional right to a fair trial and appeal. This misconduct reflects a broader problem within the judicial system, highlighting systemic issues that must be addressed. The Defendants neglected their duty of care, and their actions led to undeniable harm, emphasizing the need for accountability and reformation within the judicial system.

227. Public employees are liable for injuries caused by their acts or omissions to the same extent as private persons. The defendants were obliged to exercise ordinary care in handling Ms. McGagh's psychiatric information. This duty included refraining from sharing sensitive information and preventing the dissemination of information that came into their possession.

228. The defendants shared Ms. McGagh's psychiatric information and false evidence for personal, non-judicial purposes through electronic transmission and with members of the public. They were in positions of authority and trust, and their actions violated legal obligations and ethical standards governing the treatment of sensitive health information. The municipal entities and the defendants foresaw or should have foreseen that their conduct would injure the Plaintiff.

229. The sharing of false evidence and psychiatric information directly violated the defendants' duty of care, resulting in severe emotional distress for Ms. McGagh. As a direct and proximate result of the

defendant's conduct, Ms. McGagh has suffered and continues to suffer severe emotional distress. The extent of this distress will be proven at trial.

230.    The defendants' actions were negligent but also oppressive, fraudulent, and malicious. The Plaintiff is entitled to punitive or exemplary damages in an amount appropriate to punish the Defendants and to serve as a deterrent to similar conduct. At all relevant times, the Defendants acted under the color of law.

231.    The Defendants' negligence in including and disseminating false evidence and private medical information caused significant harm to Ms. McGagh. They breached their duty of care, resulting in emotional distress and other damages. The Plaintiff seeks punitive or exemplary damages to hold the Defendants accountable and to deter similar future misconduct. Ms. McGagh deserves compensation for the harm and suffering inflicted upon her due to the Defendants' negligent and malicious actions.

232.    The defendants committed the alleged acts recklessly and with callous disregard for the Plaintiff's rights, entitling the Plaintiff to punitive damages in an amount appropriate to punish the defendants and make an example of them to the community. Past lawsuits against them, paid with taxpayer money, have failed to deter their unlawful behavior.

**PRAYER FOR RELIEF: Ms. Mc Gagh Asks the Court for the following:**

1.  Award Plaintiff compensatory damages in an amount to be determined at trial for the pain, suffering, emotional distress, humiliation, and financial losses she has sustained and continues to sustain as a direct and proximate result of the Defendants' conduct.

2.  Award Ms. McGagh punitive damages to the extent permissible by law, sufficient to punish defendants for their malicious, willful, and reckless misconduct and to deter similar future conduct.

3.  Issue a declaration that the actions and conduct of the Defendants violated Plaintiff's constitutional rights and were ununlawful.

4.  Issue a temporary restraining order to prevent the defendants from retaliating against Ms. McGagh Grant and an injunction preventing defendants from engaging in such ununlawful practices in the future, ensuring that no other individuals are subjected to similar misconduct.

5.  Appoint a Civil Rights Attorney to represent Ms. McGagh.

6.  Award pre-judgment and post-judgment interest as allowed by law.

7.  Order the Department of Justice to conduct a criminal investigation into the defendants' actions.

8.  Grant further relief as the Court may deem just and proper.

The plaintiff demands a trial by jury on all triable issues. The allegations in this complaint are based on Ms. McGagh's knowledge and beliefs and evidence from others.

Respectfully submitted,

*Karen Campbell McGagh*

Karen Campbell McGagh
4307 Regalwood Terrace
Burtonsville, MD 20866
Cell: 667-206-0208 | Email: karencampbellmcgagh@gmail.com